UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **MAGICON, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| **v.** | § | **CIVIL ACTION NO. 4:08-cv-03639** |
| | § | |
| **WEATHERFORD INTERNATIONAL,** | § | |
| **INC.  D/B/A WEATHERFORD** | § | |
| **INTERNATIONAL, LTD. ,** | § | |
| | § | |
| **Defendant.** | § | |

------------------------------------------------------------

| | | |
|---|---|---|
| **WEATHERFORD INTERNATIONAL,** | § | |
| **INC., and WEATHERFORD U.S., L.P.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO. 4:08-cv-03636** |
| | § | |
| **MAGICON, LLC, KING WADE** | § | |
| **BENNETT, Individually, BOBBY DIAZ,** | § | |
| **Individually, JOE PUCCIA, Individually,** | § | |
| **and MARK DONAHO, Individually,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the Cross-Motions for Partial Summary Judgment of Defendant Weatherford International, Inc. d/b/a Weatherford International, Ltd ("Weatherford") (Doc. No. 32) and MagiCon LLC ("MagiCon") (Doc. No. 38) regarding the ownership of copyrights to several software applications. For the following reasons, both Motions must be denied.

## I.    BACKGROUND

Weatherford and MagiCon filed suit against each other to address claims for relief arising out of an agreement under which MagiCon would produce what the parties refer

1

to as the Forecasting Module.[1] In November 2008, MagiCon filed a petition in Harris County, that was timely removed, for breach of contract or quantum meruit for $293,750, among other claims. In addition, Weatherford separately filed suit against MagiCon in federal district court. The two actions were consolidated into the present action.

MagiCon was formed in September 2001 by Mark Donaho who remained a principal of MagiCon until he left the company in 2008. In mid-2007, King Wade Bennett acquired a 50 percent interest in MagiCon as a business analyst. Bennett has no software development expertise and never wrote software for MagiCon. In May 2008, Donaho and Bennett began to contest their interests in MagiCon, and Bennett filed suit in the District Court of Harris County, Texas, to affirm his 50 percent ownership of MagiCon ("Donaho-Bennett Litigation").[2] The Harris County court required MagiCon to enter into a receivership, with David Fettner as the court-appointed receiver. In June 2008, that court issued a temporary injunction against Donaho to "desist and refrain from … using intellectual property, source code, software products … in which Bennett [acting as MagiCon] has an ownership interest" and "to desist and refrain from selling, licensing or otherwise profiting from" specific software applications, including a [web based asset management system ("WBAMS"), web asset manager ("WAM"), and] iMarks.[3] On appeal, the Texas Court of Appeals concluded that, because neither the pleadings nor the evidence addressed Donaho's conduct regarding the software applications, the trial court's temporary injunction was overbroad. The Court of Appeals deleted the paragraph

---

[1] Other relevant facts are described in prior orders in this case.

[2] *King Wade Bennett, individually and derivatively, on Behalf of Magicon, LLC v. Mark Donaho*, Cause No. 2008-30917, 165th District Court, Harris County, Texas. This action was settled in March 2009 pursuant to an agreement filed under seal.

[3] *King Wade Bennett, individually and derivatively, on Behalf of Magicon, LLC v. Mark Donaho*, Cause No. 2008-30917 (165th District Court, Harris County, Texas June 9, 2008, Doc. No. 37, Ex. C.) Magicon apparently offers this sentence to impeach Donaho's credibility in his declaration, not for any possible res judicata or collateral estoppel effect.

of the injunction prohibiting Donaho from "selling, licensing, or otherwise profiting from ... WBAMS, WAM, ... and iMarks."[4] The Donaho-Bennett Litigation was resolved by a confidential settlement effective March 24, 2009 and Fettner's role as receiver ended at the close of the litigation pursuant to an order of April 13, 2009.

Weatherford now moves for a declaratory judgment that the works iMarks, WBAMs, WAM (collectively "Works in Question") and "Forecasting Module"[5] are owned by Weatherford because of a written agreement that it argues is still in full force between MagiCon and Advantage Engineering Services, Inc. ("Advantage"), a company now owned by Weatherford. Weatherford contends that the Forecasting Module, or aspects of the Forecasting Module, is a derivative work of the Works in Question and, therefore, whichever party owns them also owns the copyright to the Forecasting Module as a derivative work. MagiCon cross-moves for a declaratory judgment that it is the true owner of the copyrights for these four software applications.

Weatherford owns Advantage because of a long chain of acquisitions. Both parties concede that Advantage is a wholly owned subsidiary of Computalog Holdings, Inc., a foreign corporation. On December 16, 2004, Precision Energy Services, Inc. merged with and into Computalog, U.S.A., Advantage's parent, under the name Precision Energy Services, Inc.[6] (Decl. Scott H. Brown, at ¶ 3e.) Scott Brown, the corporate secretary of Weatherford, testifies via declaration that, on August 31, 2005, Weatherford assumed all rights and obligations of Precision Drilling Holdings, Inc. and became the

---

[4] *Donaho v. Bennett*, No. 01-08-00492-cv, 2008 WL 4965143 (Tex. App.—Houston [1st Dist] 2008, no pet.).
[5] In a September 8, 2008 letter to MagiCon's receiver and its counsel, Weatherford confirmed its decision to discontinue any further software development efforts with MagiCon, to abandon the Forecasting Module written by MagiCon that is the subject of the June 2007 "proposal", and to proceed anew with the code development rather than rely on any code written by MagiCon. (Doc. No. 43, Ex. C.)
[6] MagiCon also notes that Precision Energy Services, Inc. acquired Advantage.

sole stockholder of Precision Drilling Holdings, Inc. (Brown Decl. ¶ 3j.) Precision

Energy Services, Inc. is wholly owned by Precision USA Holdings Inc.[7] that is in turn

owned by PD Holdings (USA), L.P. PD Holdings (USA), L.P. is 99 percent held by

Precision Drilling LP, Inc., which is owned by Precision Drilling Holdings, Inc.

Consequently, Weatherford is part of a long chain of corporate ownership that almost

wholly owns Precision Energy Services, Inc. that in turn owns Advantage.

     In December 2001, when Advantage retained MagiCon to automate some of

Advantage's processes, Advantage's then-president (now "head") Mike Larronde asked

MagiCon to sign an agreement to assign all intellectual property to Advantage associated

with the work MagiCon did for Advantage. (Larronde Decl. ¶¶ 5-6.) MagiCon and

Advantage entered into an agreement that explained that MagiCon:

> shall assist [Advantage, its parent company, its affiliates, successors and
> assigns] during and subsequent to [MagiCon's] service in every proper
> way (solely at [Advantage, its parent company, its affiliates, successors
> and assigns'] expense) to obtain patents or Intellectual Property (IP)
> protection for the [Advantage's, its parent company, its affiliates,
> successors and assigns] own benefit in any or all countries of the world,
> and to sign all proper papers, patent applications, assignments and other
> documents necessary for this purpose, it being understood that such ideas,
> conceptions, improvements, patent applications, patents and IP will
> remain the sole and exclusive property of [Advantage, its parent company,
> its affiliates, successors and assigns].

(Contractor Disclosure and Invention Agreement, "Advantage Agreement" at ¶ 2.) In

addition, the Advantage Agreement clarified that:

> [MagiCon] represents that except as stated on the back of this Agreement,
> [MagiCon] has no agreements with or obligations to others in conflict with
> the foregoing and that any conceptions or ideas [MagiCon] now has if

---

[7] MagiCon presumes that Weatherford acquired Precision USA Holdings, Inc. and that Precision Drilling
Holdings, Inc. is actually Precision USA Holdings, Inc. It appears that Weatherford owns Advantage
through some configuration of acquisitions. MagiCon does not contest that Precision Energy Services, a
Weatherford company beginning in 2005, acquired Advantage in 2004. It only notes that by 2007 Precision
Energy Services owned Advantage.

further developed into inventions, Applications or Copyrights would be assignable to [Advantage, its parent company, its affiliates, successors and assigns] under this Agreement.

(*Id*. at ¶ 4.)

MagiCon contends that three other events indicated its ownership of the Works in Question. Weatherford does not dispute these events occurred but challenges their effect. First, in March 2006, Donaho sent a proposal with terms under which MagiCon would develop the WBAMS program for Weatherford ("WBAMS Proposal").[8] (Doc. No. 37, Ex. J.) Donaho proposed that MagiCon grant to Weatherford a world-wide, nonexclusive and transferable right and license to use the software. (*Id*.) Otherwise, Donaho suggested, MagiCon would have all proprietary rights to the software, including all copyrights, patents, trade secret rights, and other rights. (*Id*.) Neither party presents a signed copy of the final WBAMS Proposal. Second, in March 2007, Donaho sent an e-mail to Bennett, his new business partner, with a "quick list of applications we have" which included the Works in Question. (Doc. No. 37, Ex. K.) Third, in November 2007, Bennett and Eva Ellison, a Weatherford employee, corresponded about Ellison serving as a reference for MagiCon because another company, FMC Technologies, was interested in "Forecasting."[9] (Doc. No. 37, Ex. M.)

Weatherford avers that, in the course of a separate event, MagiCon has essentially waived its right to assert ownership of the Works in Question and the Forecasting Module. Again, MagiCon does not contest that this event occurred. In September 2008, during the Donaho-Bennett Litigation, Weatherford wrote a letter to Fettner in his capacity as MagiCon's receiver. In that letter, it asserted its claim that, because of the

---

[8] Weatherford contends that the WBAMS proposal is undated. It is, however, allegedly attached to and referred to in an e-mail dated March 2006.

[9] MagiCon contends that Forecasting is the same as the Forecasting Module.

Advantage Agreement, Weatherford owned the code needed to complete the Forecasting Module (presumably including iMarks, WBAMS and WAM although they are not named), and asked Fettner to notify Weatherford's counsel immediately if MagiCon believed that the Advantage Agreement terms were not operative, not applicable, or had been disavowed. (Doc. No. 49, Ex. E, at 4.) Fettner allegedly did not respond.

In the current action, MagiCon and Weatherford each seek recovery for copyright infringement, as well as for misappropriation of trade secrets and unfair competition. The ownership of the Works in Question and the Forecasting Module underpins several of the claims for relief in this action. MagiCon contends that the Works in Question and the Forecasting Module were created using "off the shelf" MagiCon code—code that was previously developed by MagiCon and is MagiCon's intellectual property. MagiCon avers that, in creating these programs for Weatherford, Weatherford supplied MagiCon with Weatherford data and methodologies that MagiCon incorporated into its off the shelf code to meet Weatherford's requirements. MagiCon asserts that it owns its work in those programs (the off the shelf code), but does not own the information that Weatherford supplied. Weatherford, in contrast, avers that the Forecasting Module is a derivative work of the Works in Question, which it contends it owns in full because of the Advantage Agreement and for which it has recently filed copyright registrations. The parties also pursue contract claims against each other based on the contested amounts owed for the development of the Forecasting Module. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), 1367.

## II. SUMMARY JUDGMENT

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c).  Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted).  A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.*  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. MOTIONS TO STRIKE

Both MagiCon and Weatherford move to strike several declarations offered in support of their Motions for Partial Summary Judgment.

### A. MagiCon's Motion to Strike the Declarations of Mike Larronde, Scott H. Brown, and Mark Donaho

#### 1. Declaration of Mike Larronde

MagiCon moves to strike the declaration of Mike Larronde, Advantage's former President and current Head of Advantage, because it contends that Larronde is testifying about the legal effect of the Advantage Agreement when it is actually the Court's job to construe an unambiguous written instrument. In addition, MagiCon contends that Larronde provides conclusory statements about the business and legal structure of Weatherford. Weatherford does not respond to these arguments. The Court agrees that it is its province to determine the legal effect of the Advantage Agreement. To the extent that the language contained therein is unambiguous, it will not rely on the subjective understanding of Larronde for this purpose. MagiCon's Motion to Strike shall be denied as moot.

### 2. Declaration of Scott H. Brown

MagiCon moves to strike the declaration of Scott H. Brown because it contends that Brown testifies to the corporate history of Advantage Engineering without attaching the corporate documents on which he relies. As argued above regarding Larronde's declaration, MagiCon contends that Brown cannot supplant the Court's determination about the legal effect of the Advantage Agreement or testify as an expert as to the contract's effect. MagiCon also contends that Brown's testimony is based on corporate documents, and therefore hearsay, because he is recounting what the documents state. Weatherford does not respond to these arguments. As noted above, the Court agrees that it is its province to determine the legal effect of the Advantage Agreement. To the extent that the language contained therein is unambiguous, it will not rely on the subjective understanding of Brown for this purpose. Because the actual configuration of Weatherford's ownership of Advantage does not influence the outcome discussed below,

the Court will not rely on Brown's version of the corporate history in its decision below and, therefore, MagiCon's Motion to Strike shall be denied as moot.

### 3. Declaration of Mark Donaho

MagiCon seeks to strike the declaration of Donaho, MagiCon's former principal, because his testimony is allegedly biased. MagiCon notes that Donaho was involved in the Donaho-Bennett Litigation concerning the ownership shares of Donaho and Bennett. MagiCon also notes that Donaho left MagiCon in May 2008 and is currently employed by Weatherford (or at least performs work for Weatherford). In addition, MagiCon contends that Donaho's statements are belied by the record because he sent Weatherford proposals regarding the Works in Question suggesting that MagiCon was their owner. MagiCon contends that Donaho cannot supplant the Court's determination about the legal effect of the Advantage Agreement or testify as an expert as to the contract's effect. As noted above, the Court agrees with this last contention to the extent the contract language is unambiguous.

Weatherford responds that the Donaho-Bennett Litigation concluded in a settlement effective March 24, 2009. Consequently, when MagiCon made its Motion to Strike Donaho's declaration, the legal dispute between Bennett and Donaho had ended. Weatherford responds that, even though Donaho now performs contract work for Weatherford, in the current litigation, Donaho is an adverse party to Weatherford. Weatherford further contends that Donaho has consistently maintained that Weatherford owns the software applications at issue. Lastly, Weatherford argues that Donaho only offers his opinion as to the meaning of the Advantage Agreement when he signed it.[10]

---

[10] In the temporary injunction hearing at the in the Donaho-Bennett Litigation, Donaho testified that Weatherford owned the works in question. *Bennett v. Donaho*, No. 01-08-00492-cv, Temporary Injunction

The Court assumes that testimony provided under the penalty of perjury, such as in Donaho's declaration, may be self-serving given that Donaho, as all litigants, provides his version of the facts; but this alone does not render the declaration inadmissible. MagiCon, however, has provided no competent evidence that Donaho's testimony is completely untrustworthy or not based on personal knowledge such that his declaration must be struck. MagiCon's Motion to Strike Donaho's declaration will therefore be denied as moot as to Donaho's purported attempt to testify regarding the legal effect of the contract and denied as to the remainder of its arguments.

### B. Weatherford's Motion to Strike Evidence from the Donaho-Bennett Litigation and To Strike the Affidavit of David Fettner

#### 1. Testimony of Joe Puccia and Bobby Diaz from the Donaho-Bennett Litigation

Weatherford moves to strike proffered evidence from the Donaho-Bennett Litigation because it was not a party to the litigation and because the proffered deposition excerpts are purportedly carefully orchestrated self-serving statements. (C.A. No. 8-cv-3639, Doc. No. 37, Exs. Q, R.) MagiCon responds that it is improper for a Court to strike statements based on Weatherford's inability to cross-examine Diaz and Puccia in the course of the Donaho-Bennett Litigation. In addition, MagiCon notes that the statements meet the requirements of FED. R. CIV. P. 56(e) because Diaz and Puccia made the statements based on their personal knowledge and set forth facts that are admissible in

---

Hr'g Tr. 54:7-19 (Harris County 165th Judicial District June 9, 2008). Donaho was asked whether a time-and-materials contract would include working on some unspecified applications owned by MagiCon. Donaho responded that the applications were not owned by MagiCon but by Weatherford and this ownership was an understanding that Donaho had with Mike Dove. Because Donaho is a party-opponent to Weatherford in this action, this statement maybe properly admitted as non-hearsay as the admission of a party opponent. FED. R. EVID. 801(d)(2).

evidence. MagiCon avers that the sworn statements are no more self-serving than any declaration provided in support of any motion made in the course of litigation.

In briefing the pending motions, Weatherford has had an opportunity to introduce competing affidavits and evidence to rebut the testimony of Puccia and Diaz. On the other hand, given that these statements are testimony from a prior proceeding to which Weatherford was not a party, to the extent that they are offered for the truth of the matter asserted, they are inadmissible hearsay. MagiCon does not contend that the person cross-examining Puccia and Diaz had a similar motive to develop the testimony as Weatherford in this proceeding. FED. R. EVID. 803, 804. MagiCon proffers the deposition testimony to describe Donaho's allegedly improper conduct in creating the impression that the Forecasting Module was farther from completion than it actually was and to suggest that Weatherford is now using the Forecasting Module. (MagiCon's Resp., C.A. No. 08-cv-3639, Doc. No. 37, at 8-9.) These statements must be excluded as hearsay and will not help form the basis for this decision.

### 2. Affidavit of David Fettner

Weatherford moves to strike Fettner's affidavit because it was signed by Fettner three days after MagiCon, Bennett, and Donaho settled their differences in state court. Moreover, Weatherford contends that Fettner's statements might be sanctionable because "of the lack of candor with respect to the [Donaho-Bennett] litigation" given that Fettner's court-appointed receivership of MagiCon ended upon the conclusion of the litigation. MagiCon responds that Fettner's Affidavit simply authenticates documents and records attached to MagiCon's Response. MagiCon notes that Fettner's receivership terminated upon a court order dated April 13, 2009 and, consequently, Fettner was the

court-appointed receiver when he executed his affidavit. Weatherford does not reply to these contentions. The Court does not find that Weatherford's contentions support its motion to strike, and it will be denied as to Fettner's Affidavit.

## IV. COPYRIGHT PROTECTION

MagiCon contends that the dispositive question now before the Court is whether the Advantage Agreement was a work-for-hire agreement such that Weatherford owns the copyrights for works produced pursuant to the Agreement. Weatherford responds that the Advantage Agreement is a valid assignment to transfer copyright whether or not it is a work-for-hire agreement. Moreover, Weatherford contends that this assignment was valid at least from December 6, 2001, the date the Advantage Agreement was signed until May 13, 2008, when Donaho left MagiCon.

### A. Works for Hire

MagiCon contends that the Advantage Agreement is not a work-for-hire agreement.[11] Weatherford explains that it has never argued that the Advantage Agreement should be construed as such. Consequently, although the Court finds MagiCon's arguments compelling on this point, the Court need not address this line of argument. *See, e.g.*, 17 U.S.C. § 101(2) (requiring a written instrument in which both parties expressly agree that the work shall be considered a work made for hire); *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989) (holding that an independent contractor retains the right to copyrights for work developed for a hiring

---

[11] Typically, the creator of the copyright is considered the author of the copyright and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright. *See, e.g*, 17 U.S.C. § 201. An exception is for works for hire: a "work made for hire" is either a work made by an employee within the scope of his or her employment or a work "specially ordered or commissioned for use ... if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101.

party unless that party has the right to control the manner and means by which the product is accomplished as evaluated by a consideration of several factors).

### B. Is the Advantage Agreement a Valid Assignment of Copyright?

Weatherford avers that the Advantage Agreement is a valid contractual assignment, pursuant to 17 U.S.C. § 201(d)(1), of all intellectual property rights from MagiCon to Weatherford as a "successor in interest" and an affiliate of Advantage R&D, Inc.[12] (Decl. Scott H. Brown at ¶¶ 4-5; Decl. Mike Larronde at ¶ 9; Decl. Mark Donaho at ¶ 5d.) Weatherford contends that it owns the Works in Question.[13] Weatherford points to the language in the Advantage Agreement that:

> [MagiCon] shall assist Company during and subsequent to [MagiCon's] service in every way ... to obtain patents or Intellectual Property (IP) protection for the Company's own benefit in any or all countries of the world, and to sign all proper papers, patent applications, assignments and other documents necessary for this purpose, it being understood that such ideas, conceptions, improvements, patent applications, patents and IP will remain the sole and exclusive property of Company.

(Advantage Agreement ¶ 2.) The Agreement explains the term "Company" as follows: "Advantage Engineering Services, Inc., its parent company Computalog U.S.A., Inc., its affiliates and its successors and assigns (hereinafter—together called 'Company')." (Advantage Agreement Introduction.)

Weatherford contends that it is a "successor in interest" and an affiliate of Advantage. Brown testifies via declaration that as a consequence of all the acquisitions and ownership chains, described above, Advantage is an affiliate of Weatherford and Weatherford is a "successor in interest" to all contracts and obligations of Advantage. In

---

[12] This is the new name of Advantage Engineering Services, Inc, the signatory to the Advantage Agreement.

[13] Weatherford responds to MagiCon's arguments concerning the Forecasting Module by explaining that, while it does not claim copyright ownership to the Forecasting Module directly, the Forecasting Module is a derivative work of earlier works written by MagiCon for Weatherford.

support of its ownership claims, Weatherford notes that it filed certificates of registration for copyrights for the programs at issue. *See* 17 U.S.C. § 408(a) (allowing the owner of a copyright to obtain registration for that copyright). Weatherford's registrations were filed in November 2008.[14] (C.A. No. 8-cv-3639, Doc. No. 32, Exs. E-J.)

MagiCon responds that the Advantage Agreement does not amount to a valid assignment of copyrights.[15] First, it contends that the Advantage Agreement only governs works created before December 2001, when the Advantage Agreement was executed. It notes that the Agreement, in part, reads:

> [MagiCon] represents that except as stated on the back of this Agreement, [MagiCon] has no agreements with or obligations to others in conflict with the foregoing and that any conceptions or ideas [MagiCon] now has if further developed into inventions, Applications or Copyrights would be assignable to Company under this Agreement.

(Advantage Agreement ¶ 4.) The copy of the Agreement provided to the Court has no writing on the back. MagiCon avers that, for Weatherford to succeed on its claim that the Forecasting Module was assigned, if the Agreement applies at all, Weatherford would

---

[14] MagiCon filed its Complaint in the state lawsuit, that eventually was removed to this Court, before Weatherford filed its copyright registrations.

[15] MagiCon contends that, because both parties concede that the contract is unambiguous, the Court must enforce it as written. "When a court concludes that contract language can be given a certain or definite meaning, then the language is not ambiguous, and the court is obligated to interpret the contract as a matter of law." *DeWitt County Elec. Co-op., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999) (citing *Coker v. Coker*, 650 S.W.2d 381, 393 (Tex. 1983)). "A term is ambiguous if it is susceptible to 'more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Bloom v. Hearst Entertainment, Inc.*, 33 F.3d 518, 522 (5th Cir. 1994) (internal citations omitted). If a contract is ambiguous, the parties' intent is determined by the fact finder. *Coker v. Coker*, 650 S.W.2d at 395. Ambiguity does not arise each time the parties offer conflicting interpretations of the contract. *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996). A contract is ambiguous only when it is susceptible to more than one reasonable interpretation. *See Frost Nat'l Bank v. L&F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005). One of the basic tenets of contract interpretation is that the parties intend all parts of the contract to have meaning. *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 235 (Tex. 2003). Extrinsic evidence is not admissible to render an unambiguous contract ambiguous. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450-51 (Tex. 2008). In determining whether a contract is ambiguous, the court is to examine all parts of the contract and the circumstances surrounding the formulation of the contract. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d at 450 (citing *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 591 (Tex. 1996)).

need to establish that the Works in Question and the Forecasting Module were MagiCon's idea or creation as of December 2001 when the Advantage Agreement was signed. Second, MagiCon avers that, unless the Advantage Agreement assigned prospective works, the portions of the projects that are not Weatherford data are owned by their author, here MagiCon. MagiCon contends that the only way to assign copyrights of works that have not yet been created is by a work-for-hire agreement. *See Contractual Obligations Prods., LLC v. AMC Networks, Inc.*, 546 F.Supp.2d 120, 127 (S.D.N.Y. 2008) (refuting the plaintiff's contention that work that has not yet been created can never be assigned by discussing the work-for-hire doctrine as an example of a prospective assignment). Consequently, MagiCon contends, unless the Agreement was a work-for-hire agreement, it could have governed only works in existence at the time. Third, MagiCon notes that, for a valid assignment pursuant to the Copyright Act, the parties must express agree to the assignment in a signed, written instrument, which it contends the Advantage Agreement is not. Lastly, MagiCon contends that, after Advantage was purchased, MagiCon began performing projects directly for Weatherford, not Advantage.

Copyright ownership of a work vests initially in the author, whether there is one or more author.[16] 17 U.S.C. § 201(a). Copyright ownership may be transferred with an instrument of conveyance, in writing, signed by the owner of the rights or the owner's agent. 17 U.S.C. §§ 201(d)(1), 204(a); *Quintanilla v. Texas Television, Inc.*, 139 F.3d 494, 499-500 (5th Cir. 1998). A transfer of copyright is not valid "unless an instrument of

---

[16] A certificate of registration creates a prima facie presumption of validity of the copyright. *See* 17 U.S.C. § 410(c) ("In any judicial proceedings the certificate of a registration made before or within five years after first publication of the work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate."). This presumption may be rebutted.

conveyance, or a note or memorandum of the transfer, is in writing and signed by the owner of the rights conveyed or such owner's duly authorized agent." 17 U.S.C. § 204(a).

The Fifth Circuit has adopted a liberal standard to evaluate whether a writing is adequate: the writing may be only a one-line statement that shows an agreement to transfer copyright. *Lyrick Studios, Inc. v. Big Idea Productions, Inc.*, 420 F.3d 388, 391-92 (5th Cir. 2005) (citing *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 557 (9th Cir. 1990)); *National Association for Stock Car Auto Racing, Inc. (NASCAR) v. Scharle*, 356 F.Supp.2d 515 (E.D.Pa. 2005) (holding that a master agreement between an independent contractor and a company hired by NASCAR to design a trophy satisfied the § 204 requirements because the contractor agreed to sell the copyrights of the art to be executed by the independent contractor, which encompassed the trophy). *See also Compaq Computer Corp. v. Ergonome Inc.*, 210 F.Supp.2d 839, 844-45 (S.D. Tex. 2001) (holding that  a writing was a valid assignment when it memorialized the intent for one party to own the copyrights and a price term). *But see, e.g. Playboy Enters., Inc. v. Dumas*, 53 F.3d 549, 560 (2d Cir. 1995) (holding that the statement "payee acknowledges payment in full for the assignment to Playboy Enterprises, Inc. of all right, title and interest in and to the following items: [description of the painting at issue followed]" was insufficient to transfer copyright because it was too vague). The main purposes of § 204(a) are to ensure that the copyright is not inadvertently transferred, to ensure what rights at what price are being transferred, and to resolve later disputes. *See Lyrick Studios, Inc.*, 420 F.3d at 392; *Effects Assocs.*, 908 F.2d at 557. When a purported writing does not specify the subject matter and cannot, under any definition, be described as defining the particulars of the

deal, it fails to assign a copyright. *See, e.g. Foraste v. Brown University*, 290 F.Supp.2d 234, 240 (D.R.I. 2003).

The issue of whether the parties' writings satisfy § 204(a), when the writings are undisputed, is one of law. *Lyrick Studios, Inc.*, 420 F.3d at 392 (5th Cir. 2005). When interpreting these writings, a court typically uses state contract law. *See* 3 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 10.08[B] (Matthew Bender, Rev. Ed.); *see also Fantastic Fakes v. Pickwick Intern., Inc.*, 661 F.2d 479, 483 (5th Cir. Unit B Nov. 1981) (noting that there might be times when state rules of construction would invalidate rights provided under copyright law but declining to set forth those "extreme" situations).

Post-deal writings can meet the § 204(a) requirements, at least against challengers who are not parties to the initial deal. *See Lyrick Studios, Inc.*, 420 F.3d at 392 (internal citations omitted). However, when the writing occurs years after the initial alleged agreement and during the litigation regarding the copyright, it usually cannot be a valid § 204(a) writing. *Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 357 (9th Cir. 1994). An affidavit signed by the alleged assignee attesting to the fact of assignment is insufficient. *See Snook v. Blank*, 92 F.Supp. 518, 520 (D. Mont. 1950) (noting that the affidavit is also inadmissible as a self-serving declaration).

Here, Donaho submits a declaration that he, in his capacity as president of MagiCon, understood that MagiCon had assigned rights to the Works in Question to Weatherford via the Advantage Agreement. This affidavit is clearly insufficient to transfer copyright to Weatherford—nor does Weatherford contend it does.

Weatherford contends that the Advantage Agreement is a valid § 204 assignment. It is unclear when the Works in Question were written and who, specifically, participated in their development. Donaho provides these details about the work that MagiCon did for Advantage and Weatherford. According to Donaho and Larronde, Advantage performed the initial conceptual work for all of the programs MagiCon wrote for Advantage. (Donaho Decl. at ¶ 5g; Larronde Decl. at ¶ 13.) Advantage and MagiCon collaborated on the design so that many of the screen layouts and the program's sequence, structure and organization were originally conceived and developed by Advantage with MagiCon. (Donaho Decl. at ¶ 5g.) Donaho contends that the Works in Question were developed for Weatherford using concepts, ideas, and materials provided by Advantage or Weatherford. (*Id.* at 5i.) Donaho contends that, after Weatherford acquired Advantage and Precision Drilling, MagiCon received checks for its software development from Precision Energy Services (Advantage's purchaser) and from Weatherford International, depending on the work being done. (Donaho Decl. ¶ 5d.) The work MagiCon performed for Advantage and Weatherford was on a "time and materials" basis except for the Forecasting Module and the support/retainer for WBAMS. (Donaho Decl.  ¶ 5l.) Donaho notes that WAM and WBAMS were involved in the development of the Forecasting Module. (*Id.* at 5j.)

The Advantage Agreement does not clearly assign Advantage the copyright of the Works in Question. It requires MagiCon, as the contractor, to communicate to Company (defined, *supra*) all "ideas, conceptions, or improvements ["Ideas"]… from time of entering Company's service until Contractor's service is terminated for any reason." (Advantage Agreement ¶ 1.) It appears that Ideas encompasses only those ideas, conceptions improvements "a) which are along the lines of business, activities or

investigations of Company, or b) which result from or are suggested by any work which [MagiCon] or other Contractors do for or on behalf of the Company."[17] (*Id.*) MagiCon is required to maintain records and reports of these Ideas and developments and these records, sketches, drawings, etc., remain the Company's property. (Advantage Agreement ¶ 3.) Section 2 discusses MagiCon's obligations to assist Advantage in securing IP protection, but it is not entirely clear of what—possibly the Ideas discussed before:

> [MagiCon] shall assist Company during and subsequent to [MagiCon's] service in every proper way (solely at Company's expense) to obtain patents or Intellectual Property (IP) protection for the Company's own benefit in any or all countries of the world, and to sign all proper papers, patent applications, assignments and other documents necessary for this purpose, it being understood that such [Ideas], patent applications, patents and IP will remain the sole and exclusive property of Company.

(Advantage Agreement ¶ 2.) Later in the Agreement, in section 4, MagiCon warrants that it has no existing obligations that conflict with the foregoing. MagiCon's interpretation of this section, as limiting the scope of the contract to ideas that MagiCon had at the time of signing (December 6, 2001), is not supported by the Advantage Agreement langauge. Rather this section clarifies that MagiCon, unless otherwise noted, does not have any existing conflicts with the Company's securing protection for Ideas developed during the Agreement's lifespan:

> [Magicon] represents that except as stated on the back of this Agreement, [MagiCon] has no agreements with or obligations to others in conflict with the foregoing and that any conceptions or ideas Contractor now has if further developed into inventions, Applications or Copyrights would be assignable to Company under this Agreement.[18]

---

[17] The term Contractors (plural) is not defined.
[18] The terms Copyright and Applications are not defined elsewhere in the Agreement.

(Advantage Agreement ¶ 4.)  Given the ambiguities in the Advantage Agreement (scope of the terms discussed, whether Weatherford is an affiliate, as discussed below), it is appropriate to consider extrinsic evidence to help determine the scope of the Agreement. Donaho testifies by declaration that he signed the Agreement for the purposes of conveying all intellectual property, including the copyright of all software developed and to be developed by MagiCon to Advantage Engineering Services, Inc. (Donaho Decl. ¶ 5c.) He contends that, subsequent to signing the Agreement, Advantage gave Donaho a license for software developed for non-competitive applications outside the oil industry. (*Id.*) He does not attach this license to his declaration.

Weatherford has not established that the Works in Question or the Forecasting Module were developed within the scope of that Agreement absent a finding as a matter of law that Weatherford was clearly a part of that Agreement (discussed *infra*). Moreover, Weatherford has not established that the Advantage Agreement applies to the Works in Question. The Advantage Agreement governs MagiCon's service with Advantage for the purposes of "supplying Network Support, Desktop Support, Software Development and Software Application Support." (Advantage Agreement Introduction.) It nowhere mentions the Works in Question. It is not clear, therefore, that the Agreement assigns the copyrights from MagiCon to Advantage, its parent company, its affiliates and its successors and assigns, such that the Court may grant Weatherford's Motion for Summary Judgment. It is also not clear that the Works in Question were developed directly for Weatherford rather than for Advantage or its direct purchaser.

In addition, given that the main purposes of § 204(a) are to ensure that the copyright is not inadvertently transferred, to ensure what rights at what price are being

transferred and to resolve later disputes, the Advantage Agreement clearly fails as a sufficient 204(a) writing. If, however, the parties can present competent summary judgment evidence that they clearly understood that "Network Support, Desktop Support, Software Development and Software Application Support" encompassed the Works in Question, the Court might be able to conclude that one or the other party owned them, although the writing still seems to be completely deficient as an assignment of copyright. Although MagiCon's evidence of e-mails and proposed contracts does not establish that the Advantage Agreement was revoked or terminated, the evidence does suggest that Weatherford and MagiCon may have had a different understanding of the effect of the Advantage Agreement at the time it was signed than they do now and that further discovery may reveal contracts that shed light on the ownership of the Works in Question.

### C. Weatherford's Claim That All Software Programs are Derivative Works

Weatherford contends that, whether or not the Advantage Agreement applies, the initial software design, conceptual work and screen layouts for the Works in Question were prepared by Weatherford's employees and used by MagiCon. As support for this position, Weatherford cites Donaho and Larronde's declaration that describe a collaborative process between MagiCon, Advantage and its purported "affiliates" to develop the software for Weatherford or Advantage whereby Advantage and or Weatherford provided screen layouts, structural and organizational principals for the programs. (Donaho Decl. ¶ 5i; Larronde Decl. ¶¶ 12-13.)

A derivative work is "based upon one or more preexisting works" and the owner of a copyright may sometimes sue a party licensed to create a derivative work for

copyright infringement. *See, e.g.* 17 U.S.C. § 101; *Quintanilla v. Texas Television, Inc.*, 139 F.3d 494, 500 (5th Cir. 1998). A work is not derivative unless it has substantially copied from a prior work. *Nimmer on Copyright* § 3.01. MagiCon responds that Weatherford provided some of the inputs for the programs and MagiCon provided its source code. Without further factual development, the Court is unable to resolve this factual dispute on a motion for summary judgment and will not conclude that all of the software programs are derivative works as matter of law.[19]

### D. Whether Weatherford is an Affiliate of Advantage and a Successor in Interest

The Advantage Agreement applies to "Advantage Engineering Services, Inc., its parent company Computalog U.S.A., Inc., its affiliates and its successors and assigns." Weatherford contends that it is either an affiliate or a successor in interest of Advantage and that it impliedly assumed the Advantage Agreement when it acquired Advantage.[20]

It is fundamental that a contract is not binding on a nonparty. *See Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 337, 341 (Tex. 1968). In addition, courts recognize the separate identities of corporations even when one corporation dominates or controls another or treats it as a department, instrumentality, or agency of the other. *See, e.g.*, *Sitaram v. AETNA U.S. Healthcare of North Texas, Inc.*, 152 S.W.3d 817, 825 (Tex. App.—Texarkana 2005, no pet.) (internal citations omitted); *Pulaski Bank and Trust Co. v. Texas American Bank/Fort Worth, N.A.*, 759 S.W.2d 723, 731 (Tex. App.—Dallas

---

[19] On these facts, and without a better understanding of the contractual arrangements that might have guided the parties' conduct, it seems possible that MagiCon, Weatherford and Advantage created joint works depending on their intentions at the time the programs were created. *See* 17 U.S.C. § 101.

[20] The Court notes that it is ambiguous whether or not the second and third "its" in this definition phrase refers to Advantage or the immediately preceding noun, Computalog U.S.A., Inc. Weatherford claims a corporate relation to both, but as will be discussed below it is unclear whether the term affiliate suggests a subsidiary. Whereas Computalog has subsidiaries, Advantage may not have had them at the time the Advantage Agreement was signed; a fact that might shed light on the proper interpretation of term "affiliate".

1988, writ denied); *Norton v. Integral Corp.*, 584 S.W.2d 932, 935 (Tex. App.—Austin 1979, no writ). This similarly applies to a parent corporation and its corporate subsidiaries, assuming they are distinct legal entities.[21] *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 798 (Tex. 2002) (discussing the alter ego doctrine for purposes of personal jurisdiction). In order for a party to be held liable under another party's contract, it must either expressly or impliedly assume the obligations of the contract. *Int'l Ass'n of Machinists, Lodge No. 6 v. Falstaff Brewing Corp.*, 328 S.W.2d 778, 781 (Tex. App.—Houston 1959, no writ). An express assumption requires express promissory words, or words of "assumption" on the part of the assignee. *Lone Star Gas Company v. Mexia Oil & Gas, Inc.*, 833 S.W.2d 199, 201 (Tex. App.—Dallas 1992, no writ) (holding that even though the assignee accepted the contract subject to the former operator's gas-purchase contract, it did not obligate the assignee to pay former operator's prior debt for a breach of contract).[22] Implied covenants are not favored and courts do not lightly imply additional covenants to a contract. *Jones v. Cooper Industries, Inc.*, 938 S.W.2d 118, 124 (Tex. App.—Houston [14th Dist] 1996, writ denied).

> An implied covenant must rest entirely on the presumed intention of the parties as gathered from the terms as actually expressed in the written instrument itself, and it must appear that it was so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and therefore omitted to do so, or it must appear that it is necessary to

---

[21] The Texas Business Corporation Act governs the liability of an acquiring corporation:
B. A disposition of any, all, or substantially all, of the property and assets of a corporation, whether or not it requires the special authorization of the shareholders of the corporation, effected under Section A of this article ... or otherwise:
(1) is not considered to be a merger or conversion pursuant to this Act or otherwise; and
(2) except as otherwise expressly provided by another statute, does not make the acquiring corporation ... responsible or liable for any liability or obligation of the selling corporation that the acquiring corporation ... did not expressly assume. TEX. BUS. CORP. ACT. ANN. ART. 5.10(B).

[22] The doctrine of quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken by that party." *See Eckland Consultants, Inc. v. Ryder Stilwell, Inc.*, 176 S.W.3d 80, 87 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

> infer such a covenant in order to effectuate the full purpose of the contract as a whole as gathered from the written instrument. It is not enough to say that an implied covenant is necessary in order to make the contract fair, or that without such a covenant it would be improvident or unwise, or that the contract would operate unjustly. It must arise from the presumed intention of the parties as gathered from the instrument as a whole.

*Id.* at 124-25 (internal citations omitted). A court may also find an implied assumption on equitable grounds when the benefit of the contract is so intertwined with the burden imposed that the assignee is estopped from denying assumption. *Id.* at 125; *See also Lone Star Gas*, 833 S.W.2d at 203 (explaining implied assumption based on principles of estoppel and unjust enrichment).

Weatherford contends that an implied assumption is warranted here because both MagiCon and Advantage benefited from the contract. MagiCon received work and payment and Advantage received the help it needed as well as the ability to secure rights in the intellectual property developed under the Advantage Agreement. MagiCon continued to perform work for Advantage, despite the corporate changes that took place throughout Weatherford's corporate history. It is unclear that MagiCon's benefit from the Advantage Agreement was necessarily related or intimately intertwined with MagiCon's purported obligation to assist Weatherford in obtaining intellectual property protection for everything that MagiCon produced for Weatherford. It is possible that the Works in Question fall entirely outside the scope of the Agreement. Neither party has provided the Court sufficiently concrete evidence about when the Works in Question were developed, by whom, or for whom to resolve these issues. Consequently, nothing the parties have thus far presented suggests that Weatherford expressly assumed the contract and the contract itself is insufficiently vague to allow any implied assumption where it is unclear what benefits and burdens were exchanged with respect to the Works in Question.

### a. Affiliate

MagiCon contends that the term "affiliate," as defined by Random House, is "[t]o associate as a subordinate, subsidiary, employee or member," but, because Advantage does not "own or control" Weatherford, Weatherford is not its affiliate. MagiCon contends that, even if the Court determines that Weatherford is Advantage's affiliate, the record is devoid of evidence establishing that Weatherford has assumed any rights or obligations to the Advantage Agreement.

If a term is not defined in the contract, its ordinary meaning must be used. To determine this "ordinary meaning," the *Eckland Consultants* court consulted two dictionaries:

> [Affiliate] is generally defined as a "corporation that is related to another corporation by shareholdings or other means of control," BLACK'S LAW DICTIONARY 59 (7th ed. 1999), and as a "company effectively controlled by another or associated with others under common ownership or control." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35 (1971).

*Eckland Consultants*, 176 S.W.3d at 88 (holding that, where A was the general partner of limited liability partnership B, A controlled the business affairs of B, and because A was a wholly-owned subsidiary of C, A and C were affiliates).

Weatherford argues for the *Eckland Consultants* definition of affiliate. Weatherford objects to MagiCon's use of the Random House dictionary. Weatherford contends that the parties' intent, as expressed by the Agreement is that the purported "assignment" is to remain applicable to other future corporate forms. Weatherford contends that this clearly expressed intent suggests that MagiCon's arguments that Weatherford is not a successor, assignee, or affiliate is inaccurate and irrelevant because the intent should control.

The word "affiliation" comes from the Medieval Latin verb meaning "to adopt as a son" that evolved into a general verb suggesting "joining in association." THE BARNHART DICTIONARY OF ETYMOLOGY (Barnhart, Robert K. ed. 1995). The Webster family of dictionaries suggest that an "affiliate" is a smaller part of a larger organization, akin to a subsidiary, in line with MagiCon's definition. *See, e.g.*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 35 (1965) ("(1) a company effectively controlled by another or associated with others under common ownership or control (2) subsidiary"); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 21 (11th ed. 2007) ("an affiliated person or organization"; affiliate defined as "closely associated with another typically in a dependent or subordinate position"); RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY 22 (2d Rev. ed. 2000) ("a business concern owned or controlled in whole or in part by another business concern"). *See also* AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE ("a person, organization associated with another in a subordinate relationship") (Rev. ed 1982). The current edition of Black's Law Dictionary, however, defines affiliate without reference to a hierarchical relationship. BLACK'S LAW DICTIONARY 67 (9th ed. 2009) ("A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation.")

Consequently, the ordinary meaning of "affiliate" encompasses both an understanding of an affiliate as a subsidiary and as a related corporation regardless of how related. It seems possible, however, that the contract drafters intended affiliate to signify a subsidiary because while the term Company includes Advantage, and its parent company Computalog, *its affiliates and its successors and assigns*, the term Contractor is only defined as MagiCon *and its successors and assigns*. If the term "affiliate" could

include a company that purchased either Advantage or MagiCon, it seems odd to leave out the term "affiliate" from the definition of Contractor. Consequently, it seems likely that "affiliate" did suggest a subsidiary relationship. On the other hand, perhaps the drafting parties had good reason to limit the scope of the Agreement to only purchasers of Advantage (or Computalog) and not to purchasers of MagiCon. The Court cannot therefore, conclude as a matter of law that the term "affiliate" necessarily excludes or includes the relationship between Weatherford and MagiCon. Given that the term is ambiguous, the Court must turn to extrinsic evidence to construe the contract. Donaho's and Larronde's declarations attesting to the legal status of Weatherford vis-à-vis Advantage are not competent evidence in this inquiry.[23] For this reason also, Weatherford has not established that it owns the copyrights to the Works in Question or the Forecasting Module sufficient for the Court to grant either party's motion for summary judgment.

### b. Successor in Interest

"When used as a legal term applying to corporations, the term 'successor' has a restricted meaning." *Sitaram v. AETNA U.S. Healthcare of North Texas, Inc.*, 152 S.W.3d 817, 826 (Tex. App.—Texarkana 2005, no pet.). "'[S]uccessor normally does not mean an assignee... [r]ather a 'successor' is normally used in respect to corporate entities to describe the status of the corporation which has become vested with the rights and has assumed the burdens of another corporation by amalgamation, consolidation, or duly authorized legal succession, and does not contemplate acquisition by ordinary purchase

---

[23] For example, Donaho testifies: "I understand that Weatherford is a successor-in-interest and affiliate of Advantage Engineering Services" without providing the basis for his understanding. (Donaho Decl. ¶ 5d.) Likewise, Larronde testifies: "By express terms of the [Advantage Agreement] ... Weatherford International, Inc. is a successor in interest of the Agreement between Advantage and MagiCon." (Larronde Decl. ¶ 9.)

from another corporation." *Int'l Ass'n of Machinists, Lodge No. 6 v. Falstaff Brewing Corp.*, 328 S.W.2d at 781 (holding that purchaser of brewery's asset and property was not the brewery's successor for purposes of the contract at issue); *Sitaram*, 152 S.W.3d at 826 (quoting *International Ass'n* and holding that a purchasing company was not a successor and therefore had not assumed the liabilities of the purchase when there was no express assumption); *Farm and Home Savings Assoc. v. Strauss*, 671 S.W.2d 682, 685 (Tex. App.—Dallas 1984, no writ) (holding that a successor is not the same as a third-party purchaser).

Moreover, Texas has codified a presumption against liability for corporations that purchase all, or substantially all, of the assets of a corporation. *See* TEX. BUS. CORP. ACT. art. 5.10(B)(2); *Norfolk Southern Railway Co. v. Trinity Industries, Inc.*, No. 3-07-cv-1905-F, 2009 WL 362437, at *4 (N.D. Tex. Feb. 13, 2009) (holding that where A is the parent corporation of B, and B merged with C, A is not subject to successor liability for C because it is simply the parent corporation absent application of the alter ego doctrine). Weatherford is not Advantage's successor in interest absent evidence that Weatherford merged, consolidate or was authorized as the legal successor of Advantage. Consequently, the Court need not address MagiCon's waiver argument—that if Weatherford was assigned copyright to the Works in Question it waived that right by conduct described above including statements in the context of the WBAMS Proposal and its failure to discuss its ownership of these Works during the negotiations over the Forecasting Module.[24]

### E. Injunctive relief

---

[24] In addition, given the uncertainty as to when an agreement regarding the development of the Forecasting Module was signed, the Court may not now, on cross-motions for summary judgment, resolve the issue of whether it was signed in Donaho and Bennett's individual or representative capacities.

Weatherford contends that, even if the Court grants MagiCon summary judgment in its favor, it should not grant an injunction in its favor because MagiCon has failed to address whether Weatherford has a license. Weatherford argues that it has otherwise failed to show that it is entitled to an injunction. MagiCon contends that injunctive relief is warranted because Weatherford is infringing right now and this interferes with MagiCon's ability to control the use and licensing of its copyrighted works. In order to grant injunctive relief (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Given that the Court has not decided in MagiCon's favor on the merits, it cannot grant permanent injunctive relief. The Court, as noted above, does not have sufficient evidence to resolve the ownership of the Works in Question and, therefore, cannot decide the issue of injunctive relief at this time.

## IV.   CONCLUSION

Both parties' Motions for Partial Summary Judgment (C.A. No. 08-cv-3639, Doc. Nos. 32, 38) are **DENIED**. The stay of discovery imposed by the Court's Order is now lifted. All deadlines in this case remain as indicated by the parties' docket control order.

**IT IS SO ORDERED**.

**SIGNED** this 14 day of August, 2009.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE